**Michael J. SCHARF, Plaintiff Below, Appellant,**

v.

**EDGCOMB CORPORATION, Defendant Below, Appellee.**

No. 153, 2004.

Supreme Court of Delaware.

Submitted: Oct. 13, 2004.
Decided: Dec. 7, 2004.

---

A. Gilchrist Sparks, III (argued) and S. Mark Hurd, Morris, Nichols, Arsht & Tunnell, Wilmington, DE, for appellant.

P. Clarkson Collins, Jr., Morris, James, Hitchens & Williams, Wilmington, DE, and Elizabeth B. Sandza (argued) of LeBoeuf, Lamb, Greene & MacRae, Washington, DC, for appellee.

Before HOLLAND, BERGER and RIDGELY, Justices.

HOLLAND, Justice:

This is an appeal by the plaintiff-appellant, Michael J. Scharf ("Scharf"), from a final judgment entered by the Court of Chancery in favor of the defendant-appellee, Edgcomb Corporation ("Edgcomb"). In a post-trial opinion, the Court of Chancery held that Scharf's indemnification claim is barred by the three-year statute of limitations set forth in Del.Code Ann. tit. 10, § 8106. The Court of Chancery concluded that Scharf's claim accrued before September 17, 1993, three years before he filed his lawsuit, because prior to that time he could have been confident that the Security and Exchange Commission's ("SEC") investigation of him had been resolved with certainty.

We have concluded that Scharf's claim for indemnification did not accrue until July 7, 1994. Therefore, his complaint was timely. The judgment of the Court of Chancery must be reversed. This matter will be remanded for further proceedings in accordance with this opinion.

### Facts

The record reflects that starting in 1983, Scharf initiated a series of transactions that resulted in his becoming a major shareholder, Chief Executive Officer and Chairman of Edgcomb. He continued as a shareholder, officer and director until August 1989, when he arranged for the sale of the company to Metal Acquisition Corporation ("MAC"). That entity was controlled by the Blackstone Group.

In February 1990, the Staff of the SEC subpoenaed Scharf to provide testimony concerning his trading in the securities of Kidde, Inc. At about the same time, the SEC Staff's investigation included inquiries with respect to the Edgcomb–MAC transaction. On March 8, 1990, acting on the advice of counsel, Scharf appeared before the SEC Staff in response to its February 1990 subpoena. Scharf asserted his Fifth Amendment right to decline to answer the SEC Staff's questions.

On October 2, 1990, the SEC Staff sent Scharf's counsel a "Wells Notice."[1] His attorneys were advised that the SEC Staff intended to recommend to the SEC that it authorize the filing of a civil action against Scharf charging him with violations of the federal securities laws. At that time, the SEC Staff contended that Scharf purchased the securities of Kidde while he was in the possession of material non-public information concerning Kidde. The SEC Staff also contended that Scharf "conveyed material non-public information concerning Edgcomb, Inc. to other persons in breach of a duty of confidentiality."

The record reflects that, when the SEC investigation began, Scharf and his close personal friend, Steven Greenberg, who was also being investigated by the SEC, were similarly situated: both were the subject of the SEC Staff's investigation into trading in Kidde and Edgcomb; both had asserted their Fifth Amendment right not to testify; and both had received a

---

1. The so-called "Wells Notice" is set forth in 17 C.F.R. § 202.5(c) (2004). *See* Gregory H. Mathews, et al., *SEC Enforcement Investiga-tion: What You Need to Know,* 21 No. 10 ACCA Docket 96, 106 (2003).

Wells Notice. The Court of Chancery found that "[b]ecause of the interrelated allegations [against Scharf and Greenberg], joint representation was perceived as more effective and consistent; it would allow for enhanced 'management and control;' and it would be more 'economical' because it would avoid having multiple law firms engaged in the same activities." [2]

The Court of Chancery found that, not long after receiving their Wells Notices, Scharf and Greenberg "jointly retained the law firm of Fried, Frank, Harris, Shriver & Jacobson ("Fried Frank"), a law firm experienced in SEC matters." [3] The Fried Frank lawyers who represented Scharf included Harvey Pitt,[4] Michael Rauch,[5] and Dixie Johnson.[6] The Court of Chancery described Scharf's attorneys as "experienced lawyers of unquestioned integrity." [7]

On December 13 and 14, 1990, Scharf appeared before the SEC Staff and provided sworn testimony on a variety of topics. The SEC Staff "focused on the sale of Edgcomb and Scharf's relationship with Greenberg and Edward Downe ("Downe"), another target of its investigation." Initially, the theory of the SEC Staff's investigation was that Scharf had provided nonpublic information concerning Edgcomb to Greenberg who, in turn, had provided it to Downe as a "*quid pro quo*" for information concerning Kidde.

On April 8, 1991, the SEC Staff verbally advised Scharf's counsel that it did not intend to proceed against Scharf. Nevertheless, shortly thereafter, the SEC "served Greenberg with a subpoena for documents 'exculpatory of either Greenberg or Scharf.'" [8] Consequently, Fried Frank requested written assurance from the SEC Staff that it would not recommend an action against Scharf.

In response to that request, the SEC Staff sent a letter to Fried Frank, dated May 3, 1991. The Court of Chancery found that letter "was not unqualified." [9] The May letter stated that the SEC Staff had decided "*at this time*": (1) not to recommend an enforcement action against Scharf; (2) not to recommend an enforcement action against Greenberg with respect to insider trading in Bally securities; and (3) if Greenberg provided additional testimony promptly, to carve out its recommendation with respect to Greenberg from its recommendation with respect to other subjects of its investigation.[10] The letter also stated that the SEC Staff was continuing to gather documents and testimony with respect to its earlier allegations against Scharf. Consequently, the decision not to proceed "at this time" was only based on information "*now in* [the SEC Staff's] *possession.*" The SEC Staff's May 1991 letter further provided:

2. *Scharf v. Edgcomb Corp.,* 2004 WL 718923, at *1 (Del.Ch. Mar. 24, 2004).

3. *Id.*

4. Mr. Pitt was a senior partner with Fried Frank. He was formerly general counsel for the SEC and later became chairman of the SEC.

5. Mr. Rauch was a senior partner in Fried Frank's New York office. He had significant experience representing individuals and companies in connection with SEC investigations in both criminal and civil matters.

6. Ms. Johnson was a senior associate at Fried Frank specializing in SEC matters. She subsequently became a partner.

7. *Scharf v. Edgcomb Corp.,* 2004 WL 718923, at *12.

8. *Id.* at *2.

9. *Id.*

10. *Id.* at *1.

It would be incomprehensible if, in questioning these individuals, questions regarding Mr. Scharf and/or Bally (which would undoubtedly have been asked at an earlier stage of the investigation) must now be avoided because the Staff has determined not to recommend an action based on information *now in its possession.* We never agreed to consciously avoid seeking information which, irrespective of whether it may support or contradict our present views of this matter, would clearly be relevant.

The record reflects both Scharf and his counsel believed that there was an ongoing risk to him after receiving the May 3, 1991 letter. The Court of Chancery found "the SEC's continuing investigation of Greenberg afforded it the opportunity to develop new evidence related to Scharf." [11] As the investigation proceeded, Fried Frank continued to communicate with Scharf and with the SEC Staff. During this period, the SEC Staff continued to question the credibility of Scharf's prior testimony.

On June 4, 1992, the SEC filed a civil complaint (the "SEC Complaint") in *Securities and Exchange Commission v. Edward Downe, et al.* ("*SEC v. Downe*"). The named defendants included Edward Downe and Steven Greenberg. Scharf was not named as a defendant. Nevertheless, Scharf was specifically identified in the section of the SEC Complaint listing the "Defendants," which stated that "[a]t all relevant times, Greenberg was a business partner, confidante, and adviser to Michael Scharf ...., the former chairman of Edgcomb and/or was a consultant to Edgcomb." In a summary of the alleged *quid pro quo* scheme, the SEC Complaint made allegations that implicated Scharf, both with respect to Edgcomb and with respect to the securities of other companies in which he had traded.

The Court of Chancery found, "[t]he allegations of the SEC's complaint were at odds with testimony given by Scharf." [12] Based upon the allegations in the SEC Complaint against Greenberg, it was apparent that the SEC Staff did not give credence to either Scharf's prior sworn testimony or to an affidavit he provided in connection with a Wells submission by Greenberg. Accordingly, the Court of Chancery found from those allegations "and other information available to it, Fried Frank concluded that the SEC Staff doubted Scharf's credibility." [13]

The Court of Chancery found that the "SEC staff considered Scharf culpable" and "would have welcomed the receipt of evidence supporting [the] view." [14] Discovery in the SEC litigation was delayed, however, because of a stay that resulted from a companion criminal investigation by the United States Attorney's Office ("USAO") for the Southern District of New York. The companion criminal investigation resulted in service of a subpoena on Scharf to appear before a grand jury. Scharf retained Alan Levine of Kronish Lieb as separate criminal counsel.

Fried Frank represented Greenberg in both the SEC matter and the related criminal proceeding. Fried Frank continued to represent Scharf, however, only with respect to the SEC matter. The USAO initially made arrangements with Levine to bring Scharf before the grand jury under a grant of "qualified immunity," but later withdrew that offer. Scharf and all of his attorneys took this as an ominous sign.

11. *Id.* at *2 n. 2.

12. *Scharf v. Edgcomb Corp.*, 2004 WL 718923, at *13 n. 47.

13. *Id.*

14. *Id.* at *11.

It is undisputed that the SEC and the USAO have ways of sharing information with each other. SEC and USAO conduct following the filing of the SEC Complaint against Greenberg suggested that investigatory activities, with the intent of implicating Scharf were continuing: in interrogatory responses to *SEC v. Downe* defendant Milton Weinger, the SEC Staff listed Scharf's diaries and Scharf himself as sources of information with respect to illegal trading in Edgcomb; the SEC issued a subpoena to Scharf's bookkeeper, Mr. Maiman, and sought from him "all checks written to, or received from, . . . Michael Scharf" and "all documents . . . concerning or associated with . . . any persons . . . associated with . . . Edgcomb Corp;" and the USAO disclosed that the grand jury was investigating unnamed target(s) in connection with matters "closely intertwined" with the SEC investigation.

Scharf's deposition was noticed in the SEC proceeding against Greenberg for December 15, 1992. That date was continued. The subpoena remained outstanding at the time Greenberg settled with the SEC in 1994.

The stay of discovery in the SEC proceeding was lifted on June 2, 1993. On November 30, 1993, the SEC gave notice that it intended to file a motion to compel further discovery from Steven Greenberg. The SEC also noticed depositions of Charlotte Downe and Hugh Downe for January 1994.

In March 1994, the SEC served a request for production of documents upon Oppenheimer & Co., Inc. That request sought documents concerning Edgcomb, Kidde and Bally, all of which were matters of the initial SEC inquiry involving Scharf. In March 1994, the SEC rescheduled the deposition of Hugh Downe for April 1994. That same month, the SEC served a notice of depositions on defendant Thomas Warde and others. The SEC simultaneously filed document requests on those same individuals regarding Kidde, Bally, Edgcomb and communications with any person concerning trading in those securities.

On July 7, 1994, Greenberg settled with the SEC. In September 1994, Downe settled the claims against him with the SEC. The SEC never filed any action against Scharf. Scharf filed this action for indemnification against Edgcomb on September 17, 1996.

### Issues at Trial

Three issues were presented at trial in the Court of Chancery. The first issue was whether Scharf proved the elements necessary to support a claim for indemnification. Scharf's efforts to recover the fees that he paid to Fried Frank are premised upon the Delaware General Corporation Law,[15] Edgcomb's bylaws, and an indemnity agreement negotiated as part of MAC's acquisition of Edgcomb. The Court of Chancery held that Scharf established his right to be indemnified for the fees and expenses that he incurred in successfully resisting the SEC investigation. No cross-appeal was filed by Edgcomb and that holding is now the law of this case.

The second issue presented to the Court of Chancery was, if Scharf demonstrated that he was entitled to indemnification, were the attorneys fees and expenses he paid reasonable. This question required the Court of Chancery to resolve factual questions regarding the appropriateness of an equal division of fees between Scharf and Greenberg. The Court of Chancery held that Scharf was entitled to recover

15. *Del.Code Ann.* tit. 8, § 145 (2002).

$1,116,389.38 in legal fees and was also entitled to reimbursement of expenses incurred in the amount of $192,986.49. No cross-appeal was filed by Edgcomb and that holding is also now the law of this case.

The third issue to be resolved by the Court of Chancery was Edgcomb's affirmative defense that Scharf's claim for indemnification is barred by the applicable three-year statute of limitations. This required the Court of Chancery to determine when Scharf could have been "confident" that the SEC's investigation of him had been "resolved with certainty." That legal standard was established in an earlier pretrial ruling and became the law of the case in these proceedings.[16]

In its post-trial opinion, the Court of Chancery held that Scharf's claim for indemnification was barred by the three-year statute of limitations. That holding is challenged by Scharf. It is the only issue presented in this appeal.

### Chancery Court Indemnification Decision

The Court of Chancery held that Scharf's claim for indemnification did not accrue until he could be " 'confident' that the SEC's investigation of him had been 'resolved with certainty.' " It also held that Edgcomb had the burden of proof and persuasion on that issue. The parties agree that those holdings are both correct as a matter of law.[17] The Court of Chancery observed that certainty may exist " 'when the underlying investigation or litigation [is] definitely resolved.' "[18]

In the Court of Chancery, Edgcomb first relied upon the May 1991 letter to define the moment when the SEC investigation of Scharf had been "definitely resolved." According to Edgcomb, the SEC's May letter to Scharf's attorneys demonstrated that Scharf was no longer being investigated at that time by the SEC. If that date failed, however, Edgcomb's alternative argument in the Court of Chancery moved to June 1992 when the SEC enforcement action was filed, without naming Scharf as a defendant. According to Edgcomb, because Scharf was not named as a defendant, even though the SEC Complaint identified him as the source of the Edgcomb information, he should have been confident that he was no longer at risk.

In this appeal, as he did in the Court of Chancery, Scharf asserts that he could not be certain that no SEC action would be filed against him until Greenberg settled with the SEC in July 1994. Scharf's attorneys testified in support of that assertion. Nevertheless, the Court of Chancery concluded that "the testimony of Scharf's lawyers cannot carry the day."[19]

The Court of Chancery agreed with both of Edgcomb's arguments and concluded:

that Scharf could have been confident before September 1993 that the SEC's investigation of him had been resolved with certainty. Although May 1991 could reasonably be viewed as the time when Scharf could have had the necessary confidence that he was no longer a target of the investigation, it may have been prudent for Scharf and his attor-

16. *Scharf v. Edgcomb Corp.*, 1997 WL 762656, at *4 (Del.Ch. Dec. 4, 1997), *appeal refused*, 705 A.2d 243 (Del.1998) (hereinafter *"Scharf I"*).

17. *See In re IBP S'holders Litig.*, 789 A.2d 14, 53 n. 94 (Del.Ch.2001).

18. *Scharf v. Edgcomb Corp.*, 2004 WL 718923, at *6 (Del.Ch. Mar. 24, 2004) *quoting Simon v. Navellier Series Fund*, 2000 WL 1597890, at *9 (Del.Ch. Oct. 19, 2000).

19. *Scharf v. Edgcomb Corp.*, 2004 WL 718923, at *12.

neys to acknowledge a modicum of lingering risk derived from the investigation that was otherwise continuing. In June 1992, shortly after the filing of the SEC's complaint and Scharf's opportunity to assess it, Scharf was no longer at risk and the reasonable person in his position both would have and could have concluded with both certainty and confidence that the SEC's investigation of him had been definitely resolved. Because Scharf did not file this action until September 1996, his claim for indemnification is barred by Delaware's three-year statute of limitations.[20]

### Standard of Review

■ Whether Scharf's claim for indemnification is barred by the three-year statute of limitations is a "mixed question of law and fact." A determination of when the statute of limitations begins to run on a right to indemnification is grounded, first, in the events giving rise to the claim; and second, in the identification of what specifically identifiable event starts the statute of limitations to run, as a matter of law.[21] The first part of the inquiry involves making findings of historical fact. The second part of the inquiry is a mixed question of law and fact: "[T]he historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the [relevant] statutory [or constitutional] standard, or to put it another way, whether the rule of law

as applied to the established facts is or is not violated."[22]

■ Findings of historical fact by a trial judge are subject to the deferential "clearly erroneous" standard of appellate review.[23] This deferential standard applies not only to historical facts that are based upon credibility determinations, but also to findings of historical fact that are based on physical or documentary evidence or inferences from other facts.[24] Once the historical facts are established, however, the ultimate determination of the legal issue presented is reviewed by appellate courts *de novo*.[25]

In this appeal, Scharf does not challenge any of the historical factual findings that were made by the Court of Chancery. Instead, Scharf challenges the application of those historical factual findings to the legal standard that governs his claim and the resulting legal conclusion reached by the Court of Chancery. Therefore, applying the *de novo* standard of review, we must examine the undisputed historical factual findings and determine when Scharf's claim for indemnification began to run as a matter of law.

### May 1991 Letter

The Court of Chancery found that in May 1991, the Fried Frank attorneys representing Scharf took the unusual step of requesting that the SEC Staff provide

**20.** *Id.* at *14.

**21.** *Anderson v. City of Bessemer City,* 470 U.S. 564, 574, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985).

**22.** *Pullman–Standard v. Swint,* 456 U.S. 273, 289 n. 19, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982). *Accord Ornelas v. United States,* 517 U.S. 690, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996) and *Lopez v. State,* 2004 WL 2743545 (Del. Nov. 22, 2004).

**23.** *Anderson v. City of Bessemer City,* 470 U.S. at 574, 105 S.Ct. 1504.

**24.** *Id. Accord Levitt v. Bouvier,* 287 A.2d 671 (Del.1972).

**25.** *Pullman–Standard v. Swint,* 456 U.S. at 289, n. 19, 102 S.Ct. 1781. *Accord Ornelas v. United States,* 517 U.S. 690, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996) and *Lopez v. State,* 2004 WL 2743545 (Del. Nov. 22, 2004).

written confirmation of the Staff's position with respect to Scharf. The Court of Chancery found that the SEC's letter was "not unqualified." Nevertheless, the Court of Chancery noted that the contemporaneous handwritten notes of one of Scharf's attorneys stated, "Yes, you're out."

Scharf submits that subsequent undisputed facts in the record contradict the optimistic statement in his attorney's handwritten notes. In a memorandum written by the same attorney two months after writing the "you're out" note, she expressed Fried Frank's concerns that even though the SEC Staff said it had "concluded not to recommend action against Scharf," it was "sending subpoenas to persons who worked in the offices of Scharf and Greenberg, asking for documents and testimony about both of them" and had "apparently referred th[e] matter for criminal investigation." According to Scharf's attorney, it was "difficult to understand how the SEC Staff can conclude, on one hand, that there is insufficient information to establish civil charges, and can determine, on the other hand, to refer the matter for criminal investigation."

Scharf's argument is supported by the Court of Chancery's findings regarding Fried Frank's meetings with the SEC Staff post-dating the May 1991 letter and handwritten "you're out" note. The SEC "expressed doubts about Scharf's veracity" and "issued subpoenas to individuals who worked in the offices shared by Scharf and Greenberg [which] sought documents about both Scharf and Greenberg." The Court of Chancery also found that "the SEC staff considered Scharf culpable" and "would have welcomed the receipt of evidence supporting its view." [26]

Although Edgcomb contends that the SEC's May 1991 letter provided Scharf with certainty that no claims would be asserted against him, the letter is qualified by the statement that the SEC Staff had decided *"at this time"* not to recommend an enforcement action against Scharf, based upon information then in the SEC Staff's possession. The letter also stated that the Staff was continuing its investigation. The Court of Chancery concluded that "the SEC's continuing investigation of Greenberg afforded it the opportunity to develop new evidence related to Scharf."

Consequently, the Court of Chancery found that "[i]t is understandable that Scharf and his attorneys experienced concerns about his status despite the May letter." [27] Having found that the concern of Scharf's attorneys about his status were "understandable," the record reflects that Scharf could not have been confident the allegations against him had been resolved "with certainty" by the May 1991 letter. Therefore, the record does not support the Court of Chancery's legal conclusion that Scharf could have been confident that the SEC's potential claims against him had been resolved with certainty upon his attorney's receipt of the May 1991 letter.

### 1992 SEC Complaint

The Court of Chancery undoubtedly recognized that, if Scharf really could be confident that all of the SEC's concerns about him were resolved with certainty after the 1991 May letter, it followed logically that Greenberg could be confident that the SEC's concerns about Greenberg with Bally had also been resolved with certainty. It is undisputed, however, that the 1992 SEC Complaint charged Greenberg with regard to Bally. Therefore, instead of re-

**26.** *Scharf v. Edgcomb Corp.*, 2004 WL 718923, at *11 (Del.Ch. Mar. 24, 2004).

**27.** *Id.*

lying exclusively on its holding that the statute of limitations began to run with the May 1991 letter, the Court of Chancery also decided that issue on an independent basis. The Court of Chancery's alternative holding was that:

> [i]n June 1992, shortly after the filing of the SEC's *complaint* [against Greenberg] and Scharf's opportunity to assess it, Scharf was no longer at risk and the reasonable person in his position both would have and could have concluded with both certainty and confidence that the SEC's investigation of him had been definitely resolved.[28]

Scharf argues that "on the contrary," his attorneys continued to have what Edgcomb's expert characterized as "reasonable doubts" regarding whether claims would be asserted against Scharf by the SEC. The record supports Scharf's position and reflects why the filing of the June 1992 SEC Complaint did not provide either Scharf or his attorneys with confidence that the potential SEC claims against Scharf had been resolved with certainty.

Scharf, Edgcomb and the securities of other companies in which Scharf had also traded were all featured prominently in the SEC's Complaint. The SEC Complaint continued to advance a *quid pro quo* theory against a group of alleged insider traders. According to the SEC Complaint, Scharf informed Greenberg of his intention to sell Edgcomb, who in turn tipped Downe. Greenberg and Downe traded in Kidde, in which Scharf also traded. Scharf and Greenberg had plans with respect to Bally, about which Greenberg allegedly tipped Downe.

Given the SEC's interrelated, *quid pro quo* allegations—which were contrary to Scharf's sworn testimony—Scharf's attorneys concluded that he remained at risk so long as Greenberg and the other defendants tied to tipping or trading in Edgcomb were in a position to implicate him in wrongdoing. The record reflects that the SEC was pursuing discovery after filing its Complaint. The Court of Chancery also found that "[n]ew information from Greenberg or Downe, one of Greenberg's co-defendants who was listed in an SEC discovery response as a person having knowledge of Scharf's role, might have been obtained." [29] Edgcomb acknowledges that the SEC could amend its Complaint to allege new facts and add new defendants.

The concern that the SEC's interest in Scharf had not been resolved with certainty was increased when, at about the time of the June 1992 SEC Complaint, the USAO began a "companion" criminal investigation. In that companion criminal litigation, the Court of Chancery found that the USAO had offered qualified immunity for Scharf. When that offer of immunity was subsequently withdrawn, it was perceived by Scharf's attorneys as an "ominous" sign for Scharf.

Scharf's deposition was noticed by the SEC for December 1992. Due to a stay of discovery obtained by the USAO, that notice remained outstanding until 1994. When the stay of discovery was lifted in mid–1993, the SEC sought documents concerning Edgcomb and securities of other companies in which Scharf had traded, including Kidde.

In November 1993, the SEC indicated that it intended to file a motion to compel further discovery from Greenberg. The SEC also sought deposition testimony from certain individuals, including other

---

**28.** *Scharf v. Edgcomb Corp.,* 2004 WL 718923, at *14 (Del.Ch. Mar. 24, 2004).

**29.** *Id.*

defendants and relatives of Downe. At the time Greenberg settled in July 1994, discovery by the SEC was ongoing.

Scharf's attorneys testified that they "continued to represent Scharf through the time Mr. Greenberg settled the matter." One of Scharf's lawyers stated that he personally met or spoke with Scharf approximately thirty-five times between June 1992 and the time of the SEC's settlement with Greenberg in 1994. The evidence presented at trial reflects that three of Scharf's lawyers from Fried Frank, who the Court of Chancery found were highly experienced in SEC enforcement matters and who testified truthfully, were of the opinion that Scharf remained at risk of being added as a named defendant in the SEC proceedings until Greenberg settled. As one of Scharf's lawyers testified at trial:

> It was plain from what the SEC alleged and from what the U.S. Attorney was doing and from the course [the] investigation had taken for quite a long time that it was prudent to consider that Mr. Scharf was still under jeopardy .... [H]e thought he was still under threat, and we were certainly unable to tell him, based on what we knew, that there wasn't a rational basis for thinking so.[30]

Edgcomb's expert witness testified that "Scharf's lawyers are widely recognized as experts in SEC enforcement matters" and he "did not consider the views of Scharf's attorneys as unreasonable."[31] Thus, the record reflects that the reasonable minds of recognized legal experts could disagree about whether Scharf was still under threat until Greenberg settled with the SEC in 1994. Therefore, the record does not support the Court of Chancery's legal conclusion that Scharf could be confident that the SEC's potential claims against him had been resolved with certainty when the 1992 SEC Complaint was filed.

### Greenberg's Settlement Provided Scharf's Certainty

■ A cause of action for indemnification accrues when the officer or director entitled to indemnification can "be confident any claim against him ... has been resolved with certainty."[32] The parties to this appeal agree that "certainty" requires an "[a]bsence of doubt,"[33] and is an objective, reasonable-person standard. The parties also agree that Edgcomb bears the burdens of proof and persuasion with respect to its affirmative defense that Scharf's claim was barred by the three-year statute of limitations.

■ Generally, the matter on which the claim for indemnification is premised may be said to have been resolved with certainty only when the underlying investigation or litigation is definitely resolved.[34] "The implicit rationale for this conclusion is that the person seeking indemnity should not have to rush in at the first possible moment but rather should be able to wait until the outcome of the underlying matter is certain."[35] A successful result on a claim for indemnification in the trial court,

30. *Id.* at *12.

31. *Id.*

32. *Scharf I*, 1997 WL 762656, at *4 (Del.Ch. Dec. 4, 1997).

33. *Black's Law Dictionary* 205 (5th ed. 1979).

34. *Simon v. Navellier Series Fund*, 2000 WL 1597890, at *9 (Del.Ch. Oct. 19, 2000).

35. *Id. See also Cochran v. Stifel Fin. Corp.*, 2000 WL 286722, at *3 (Del.Ch. Mar. 8, 2000), *aff'd in part*, 809 A.2d 555 (Del.2002) (statute of limitations did not begin to run until the government's time to petition for review of the Court of Appeal's dispositive order had expired).

for example, does not cause the statute of limitations to begin running if an appeal is taken. Until the final judgment of the trial court withstands appellate review, the outcome of the underlying matter is not certain.

In its post-trial opinion, the Court of Chancery recognized that "[s]tatutes of limitations are most fairly and predictably applied with reference to a single, well-defined moment in time."[36] Unfortunately, the Court of Chancery then shifted its focus and stated: "in this case the question is not precisely when could Scharf have been 'confident' that the SEC investigation of him had 'been resolved with certainty.'"[37] Instead, the question is whether as of September 17, 1993, three years before he filed his complaint in this action, Scharf could have been 'confident' that the SEC investigation against him had been 'resolved with certainty.'"

"[A]ll statutes of limitation[s] and all statutory appeal requirements are, by their very nature, 'harsh' in that they arbitrarily establish jurisdictional prerequisites for initiating or maintaining a suit."[38] When a plaintiff fails to file a timely complaint, a jurisdictional defect is created that cannot be excused.[39] Therefore, it is imperative to identify a date certain when any statute of limitations begins to run.

The single, well-defined moment in time when the statute of limitations begins to run on claims for indemnification is when the outcome of the underlying matter is certain. This involves a two-part analysis. First, the underlying matter must be identified. Second, the date when the outcome of that underlying matter was resolved with certainty must be determined.

In this case, the underlying matter was the SEC Staff's belief that Greenberg, a close personal friend of Scharf, and others "had engaged in illicit insider trading with the benefit of nonpublic information provided by Scharf." The Court of Chancery found that the SEC's potential allegations against Scharf and the SEC Complaint against Greenberg were "interrelated."[40] The Court of Chancery also found that, during the pendency of the proceedings against Greenberg, there was a real "possibility" that the SEC could discover other "information incriminating Scharf or that others, such as Greenberg, could implicate him."[41]

In denying Edgcomb's *pretrial* motion to dismiss Scharf's complaint on the basis that it was untimely, the Court of Chancery held that, if all of the allegations in Scharf's complaint were true, Scharf could not be confident that the underlying matter that gave rise to his claim for indemnification had been resolved with certainty until Greenberg reached a settlement with the SEC in July 1994.[42] At trial, Edgcomb had the burden of proving its affirmative defense by establishing that Scharf's claim for indemnification accrued on a date certain that was three years prior to the filing of his complaint. For the reasons stated in this opinion, the Court of Chancery's undisputed findings of historical fact re-

---

**36.** *Scharf I*, 1997 WL 762656, at *4.

**37.** *Scharf v. Edgcomb Corp.*, 2004 WL 718923, at *7 (Del.Ch. Mar. 24, 2004).

**38.** *Mary A.O. v. John J.O.*, 471 A.2d 993, 995 n. 4 (Del.1983).

**39.** *Id.* at 995; *Riggs v. Riggs*, 539 A.2d 163 (Del.1988).

**40.** *Scharf v. Edgcomb Corp.*, 2004 WL 718923, at *1.

**41.** *Id.* at *13.

**42.** *Scharf I*, 1997 WL 762656, at *4.

flect that Edgcomb failed to establish that either the SEC's May 1991 letter or its June 1992 Complaint against Greenberg provided Scharf with confidence that the outcome of the underlying SEC matter involving him had been resolved with certainty.

The dispositive inquiry in this proceeding is to ascertain the *date certain* on which Scharf could be confident that the outcome of the underlying matter—Greenberg's improper use of non-public information provided by Scharf and the SEC's potential claims against Scharf—had been resolved. When Scharf's lawyers testified that Scharf was "still under jeopardy" until Greenberg settled with the SEC "based upon what we know," the context is significant. The same lawyers who were representing Scharf's interests were simultaneously defending Greenberg in the SEC matter. The record reflects that the lawyers at Fried Frank, who were jointly representing both men, were never confident that the SEC's potential claims against Scharf had been resolved with certainty, after the SEC Complaint was filed against Greenberg. Edgcomb's expert "did not consider the views of Scharf's attorneys as unreasonable."

The record reflects objective credible evidence that a reasonable person in Scharf's position could not be confident that the underlying matter—Greenberg's improper use of non-public information provided by Scharf and the SEC's potential claims against Scharf—had been resolved with certainty, until Greenberg settled with the SEC. Therefore, as a matter of law, we hold the three-year statute of limitations began to run on Scharf's claims for indemnification on the date when Greenberg settled with the SEC: July 7, 1994. Consequently, the complaint for indemnification

that Scharf filed on September 17, 1996 was timely.

### Conclusion

The Court of Chancery's judgment entered in favor of Edgcomb, on the basis that Scharf's complaint was untimely, is reversed. This matter is remanded for further proceedings in accordance with this opinion.